**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| PROJECT FOR PRIVACY | : | | |
| AND SURVEILLANCE | : | | |
| ACCOUNTABILITY, INC., | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 22-1812 (RC) |
| | : | | |
| v. | : | Re Document No.: | 26, 29 |
| | : | | |
| NATIONAL SECURITY AGENCY, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

**GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

This case arises out of a Freedom of Information Act ("FOIA") dispute between Plaintiff

Project for Privacy and Surveillance Accountability, Inc. ("PPSA") and four executive agencies:

the National Security Agency ("NSA"); the Central Intelligence Agency ("CIA"); the Office of

the Director of National Intelligence ("ODNI"); and the Department of Justice ("DOJ")

(collectively, "Defendants" or "the Agencies").  At a high level of generality, PPSA sought

records from Defendants relating to the intelligence community's acquisition or use of

commercially available information regarding specific current and former members of Congress.

Rather than conduct a search for responsive records, Defendants responded to PPSA's FOIA

request by issuing so-called *Glomar* responses—that is, statements in which they refused to

confirm or deny the existence of the records sought.  In support of their *Glomar* responses,

Defendants cited FOIA Exemption 1 and, to varying extents, Exemptions 3, 6, 7(C), and 7(E).

For the reasons described below, the Court finds that Defendants' *Glomar* responses are largely

justified and therefore affirms the Agencies' refusal to acknowledge the existence of many of the records that would (if they exist) fall within the scope of PPSA's FOIA request. However, the Court also finds that PPSA's FOIA request encompasses at least some documents whose existence (or lack thereof) would not be shielded by the various exemptions cited by Defendants. Defendants must conduct a search for those documents. The Court, therefore, grants in part and denies in part Defendants' motion for summary judgment and denies PPSA's cross-motion for summary judgment.

## II.  BACKGROUND

On July 26, 2021, PPSA sent materially identical FOIA requests to the NSA, Compl., Ex. A ("NSA FOIA Request"), ECF No. 1-1; the CIA, *id.*, Ex. E, ECF No. 1-5; the DOJ, *id.*, Ex. H, ECF No. 1-8; and the ODNI, *id.*, Ex. P, ECF No. 1-16. PPSA's letter to the DOJ stated that the request for information was specifically targeted at the Federal Bureau of Investigation ("FBI"), the National Security Division ("NSD") and the Office of Information Policy ("OIP"). *Id.*, Ex. H at 5, ECF No. 1-8. Each of PPSA's requests sought:

> All documents, reports, memoranda, or communications regarding the obtaining, by any element of the intelligence community from a third party in exchange for anything of value, of any covered customer or subscriber record or any illegitimately obtained information regarding [145 specifically-named current and former members of Congress].

*E.g.*, NSA FOIA Request at 2–5. Put another way, PPSA sought all documents relating to the intelligence community's "acquisition and use of [commercially available information]" regarding the named individuals. *See* Pl.'s Mem. P&A Supp. Cross-Mot. Summ. J. and Opp'n Defs.' Mot. Summ. J. ("Pl.'s Cross-Mot.") at 2, ECF No. 29-1. The request clarified that "responsive materials" included only those records that were "either created, altered, sent, or received between January 1, 2008 and July 26, 2021." *E.g.*, NSA FOIA Request at 5.

Defendants responded to PPSA's FOIA letters by issuing blanket *Glomar* responses refusing "to confirm or deny the existence of intelligence records on any and all [of the named] individuals." *See, e.g.*, Compl., Ex. B, ECF No. 1-2.  PPSA appealed the Agencies' blanket denials, *see, e.g.*, *id.*, Ex. C, ECF No. 1-3, but to no avail, *see, e.g.*, *id.*, Ex. D, ECF No. 1-4 (NSA letter denying PPSA's administrative appeal).  PPSA then brought suit in this Court to compel the Agencies to conduct a search for responsive records.  *See generally id.*  Defendants moved for summary judgment on the ground that their respective *Glomar* responses were adequately justified under FOIA.  *See generally* Defs.' Mot. Summ. J. ("Defs.' Mot."), ECF No. 26.  PPSA cross-moved for summary judgment, *see* Pl.'s Cross-Mot., and the motions are now ripe for review, *see* Defs.' Mem. P&A Supp. Mot. Summ. J. and Opp'n Pl.'s Cross-Mot. Summ. J. ("Defs.' Opp'n"), ECF No. 31; Pl.'s Reply Supp. Cross-Mot. Summ. J. ("Pl.'s Reply"), ECF No. 36.

### III.  LEGAL STANDARD

The Freedom of Information Act is meant "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)).  It "directs that 'each agency, upon any request for records . . . shall make the records promptly available to any person' unless the requested records fall within one of the statute's nine exemptions."  *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting 5 U.S.C. § 552(a)(3)(a)).  "Consistent with the Act's goal of broad disclosure," those exemptions should be "given a narrow compass."  *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989).  "The agency bears the burden of establishing that a claimed exemption applies."  *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1088 (D.C. Cir. 2014).

Because FOIA cases do not ordinarily involve disputed facts, they "are typically and appropriately decided on motions for summary judgment." *Moore v. Bush*, 601 F. Supp. 2d 6, 12 (D.D.C. 2009). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing whether the movant has met that burden, a court "must view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in his favor, and eschew making credibility determinations or weighing the evidence." *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008). "This burden does not shift even when the requester files a cross-motion for summary judgment because 'the Government ultimately has the onus of proving that the documents are exempt from disclosure.'" *Hardy v. ATF*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (cleaned up) (quoting *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999)). Even if a FOIA exemption applies, an agency cannot withhold information unless it also "reasonably foresees that disclosure would harm an interest protected by" the exemption. 5 U.S.C. § 552(a)(8)(A)(i)(I); *see Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (explaining the FOIA Improvement Act of 2016's "foreseeable harm" requirement).

In a typical FOIA case, "[a]n agency . . . must search for any documents responsive to the request, and must 'disclose all reasonably segregable, nonexempt portions of the requested record(s).'" *People for the Ethical Treatment of Animals v. Nat'l Institutes of Health, Dep't of Health & Hum. Servs.* ("*PETA*"), 745 F.3d 535, 540 (D.C. Cir. 2014) (quoting *Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003)). There are, however, certain cases in which "merely acknowledging the existence of responsive records would itself 'cause harm cognizable under [a] FOIA exception.'" *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C.

Cir. 2007)).  In such cases, an agency may issue a *Glomar* response, "refus[ing] to confirm or deny the existence or nonexistence of responsive records."[1]  *Elec. Priv. Info. Ctr. v. NSA* ("*EPIC*"), 678 F.3d 926, 931 (D.C. Cir. 2012).  A *Glomar* response is available to an agency only "if the fact of the existence or nonexistence of agency records falls within a FOIA exemption."  *PETA*, 745 F.3d at 540 (quoting *Wolf*, 473 F.3d at 374); *Competitive Enter. Inst. v. Nat'l Sec. Agency*, 78 F. Supp. 3d 45, 53 (D.D.C. 2015) ("[T]he Government must show that the mere fact of whether it has (or does not have) relevant records is protected from disclosure under an exemption.").

"In considering a *Glomar* response, courts apply the 'general exemption review standards established in non-*Glomar* cases.'"  *Knight First Amend. Inst. at Columbia Univ. v. CIA*, 11 F.4th 810, 813 (D.C. Cir. 2021) (quoting *Wolf*, 473 F.3d at 374).  "An agency thus bears the burden to sustain a *Glomar* response."  *Id.* (citing 5 U.S.C. § 552(a)(4)(B)).  One way in which an agency may successfully carry its burden is by submitting "affidavits explaining the basis for the response."  *PETA*, 745 F.3d at 540.  The affidavits must be "reasonably specific" and they cannot be "called into question by contradictory evidence."  *Schaerr v. U.S. Dep't of Just.* ("*Schaerr II*"), 69 F.4th 924, 928 (D.C. Cir. 2023); *see also SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (explaining that the affidavits must be "relatively detailed[,] non-conclusory, and . . . submitted in good faith" (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981))).  Such affidavits or declarations are "accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the

---

[1] The term "*Glomar* response" derives its name from a FOIA case in which the CIA "refus[ed] to confirm or deny the existence of records about 'the *Hughes Glomar Explorer*, a ship used in a classified CIA project.'"  *PETA*, 745 F.3d at 540 (cleaned up).

existence and discoverability of other documents.'"  *SafeCard Servs.*, 926 F.2d at 1200 (quoting *Ground Saucer Watch*, 692 F.2d at 771).

This is especially so in the national security context.  In that context, "the agency possesses necessary expertise to assess the risk of disclosure, and judges lack the expertise necessary to second-guess agency opinions."  *Schaerr v. U.S. Dep't of Just.* ("*Schaerr I*"), 435 F. Supp. 3d 99, 108 (D.D.C. 2020) (cleaned up), *aff'd*, 69 F.4th 924 (D.C. Cir. 2023).  Thus, "when a *Glomar* response touches upon issues of national security—'a uniquely executive purview'— courts must give agency decisions substantial deference."  *Competitive Enter. Inst.*, 78 F. Supp. 3d at 53 (quoting *EPIC*, 678 F.3d at 931).  Courts, therefore, "consistently defer[] to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review."  *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003).  In the end, courts must sustain an agency's *Glomar* response in the national security context so long as the agency's explanation appears "logical" and "plausible."  *Am. C.L. Union v. U.S. Dep't of Def.* ("*ACLU*"), 628 F.3d 612, 624 (D.C. Cir. 2011) (in the national security context, "the government's burden is a light one"); *see Schaerr II*, 69 F.4th at 929.

## IV.  ANALYSIS

As relevant here, Defendants claim that their *Glomar* responses are justified by FOIA Exemptions 1 and 3.[2]  PPSA objects that Defendants' *Glomar* responses are premature.  It argues that, before issuing *Glomar* responses, Defendants must conduct a search for responsive records.  According to PPSA, it is only after Defendants conduct such a search that they may decide whether to disavow the existence or nonexistence of the requested information.

---

[2] The FBI and the OIP also invoke Exemptions 6, 7(C), and 7(E).  *See* Defs.' Mot. at 18– 23 & n.2.

The Court's analysis proceeds in two steps.  First, the Court will address PPSA's argument that Defendants' *Glomar* responses are premature.  Because the Court concludes that PPSA's view of the law on that front is incorrect, the Court will then analyze whether Defendants' *Glomar* responses are adequately justified under FOIA Exemptions 1 and 3.

**A. Whether Defendants May Issue *Glomar* Responses Without Conducting Searches**

PPSA first contends that, before issuing a *Glomar* response, each Defendant should be required to conduct a search for responsive records.  *See* Pl.'s Cross-Mot. at 4–7.  The premise of PPSA's argument is that requiring Defendants to execute an internal search for documents would not require Defendants to disclose whether such records exist.  *See id.* at 5 ("Defendants have not provided any explanation to overcome the obvious conclusion that conducting an *internal* search for records does not itself constitute a disclosure that protected records do or do not exist.").  In PPSA's view, Defendants could conduct a search "within the secrecy of their own siloes" and then, once that search is completed, issue a response refusing to confirm or deny the existence of such records.  *Id.* at 6; *see id.* at 6–7 ("Because all of Defendants' alleged harms are premised on the *disclosure* of protected information, and because the initial step of conducting an intra-agency search makes no such disclosure, their arguments are neither logical nor plausible justifications for shirking their duty to perform an internal search." (internal citations omitted)).  PPSA contends that this fact alone provides sufficient ground on which to reject Defendants' respective reliance on Exemptions 1, 3, 6, 7(C), and 7(E) to justify their *Glomar* responses.  *See id.* at 9–10 (asserting this argument in the context of Exemption 1); *id.* at 18–19 (same in the context of Exemption 3); *id.* at 22 (Exemptions 6 and 7(C)); *id.* at 25 (Exemption 7(E)).

Whatever the theoretical merits of PPSA's position, it is a stance that is directly contrary to existing law.  D.C. Circuit precedent on the point is explicit: "an agency need not search its

records before invoking *Glomar*." *Schaerr II*, 69 F.4th at 928.  Time and again, the Circuit has

held that, "to the extent the circumstances justify a *Glomar* response, the agency need not

conduct any search for responsive documents or perform any analysis to identify segregable

portions of such documents." *PETA*, 745 F.3d at 540; *see also Schaerr II*, 69 F.4th at 929 ("An

agency need not search for records when simply recognizing the existence or nonexistence of

responsive records is protected by a FOIA exemption."); *EPIC*, 678 F.3d at 934 (explaining that

an agency need not "conduct a search" before issuing a *Glomar* response); *see also Project for*

*Priv. & Surveillance Accountability, Inc. v. U.S. Dep't of Just.* ("*PPSA I*"), No. 20-cv-3657, 2022

WL 4365745, at *6 (D.D.C. Sept. 19, 2022) (holding that agencies did not need to conduct

search "before issuing a *Glomar* response").  That is because, when an agency invokes *Glomar*,

the agency effectively "narrow[s] the FOIA issue to the existence of records *vel non*." *Schaerr*

*II*, 69 F.4th at 928 (quoting *Wolf*, 473 F.3d at 374 n.4).  Once the agency has so narrowed the

issue, the only "'relevant documents for the court to examine [become] the affidavits which

explain the [a]gency's refusal' to confirm or deny the existence of responsive records." *Id.* at

929 (quoting *Wolf*, 473 F.3d at 374 n.4).  That being so, it "would be a meaningless—not to

mention costly—exercise" to require the agency to conduct a search for records only to have the

agency later disclaim the existence or nonexistence of those records.  *PPSA I*, 2022 WL

4365745, at *6 (quoting *EPIC*, 678 F.3d at 934).

Given the above, Defendants were not required to conduct a search before issuing

*Glomar* responses to PPSA's FOIA request.  *See Schaerr II*, 69 F.4th at 928.  But even though

Defendants acted properly in *issuing Glomar* responses, they still must show that their *Glomar*

responses were justified.  *See PETA*, 745 F.3d at 540.  That is, if Defendants are to be granted

summary judgment, they must "make a threshold showing that [PPSA's] FOIA request seeks

records that fall within" Exemptions 1, 3, 6, 7(C), or 7(E).  *PPSA I*, 2022 WL 4365745, at *6

(internal alterations omitted) (quoting *Bartko v. U.S. Dep't of Just.*, 898 F.3d 51, 64 (D.C. Cir.

2018)).  They must also "explain[] with reasonable specificity" why those exemptions shield

them from acknowledging the very existence of the information sought by PPSA.  *See Schaerr*

*II*, 69 F.4th at 929.  Those are the issues to which the Court will next turn.

### B.  Whether Defendants' *Glomar* Responses Are Justified

Before analyzing whether Defendants' *Glomar* responses are justified on their merits, it

is necessary to distinguish between the types of records that may be responsive to PPSA's FOIA

request.  PPSA's FOIA request is broad: it seeks "[a]ll documents, reports, memoranda, or

communications regarding the obtaining, by . . . the intelligence community [of commercially

available information] regarding" specific current and former members of Congress.  *See, e.g.*,

NSA FOIA Request at 2–5.  As will be explained in more detail below, PPSA's request

encompasses both "operational documents" and "policy documents."  *See* Pl.'s Cross-Mot. at 10

(using these descriptions); *see also Project for Priv. & Surveillance Accountability, Inc. v. U.S.*

*Dep't of Just.* ("*PPSA II*"), 633 F. Supp. 3d 108, 115 (D.D.C. 2022) (establishing this dichotomy

to describe the scope of a similar FOIA request).  The first category includes records that reveal

information relating to the intelligence community's contemplated or actual collection, purchase,

use, or analysis of commercially available information regarding the identified members of

Congress.  The second category—the so-called "policy documents"—include records that

discuss the intelligence community's potential collection of commercially available information

on the listed individuals as a matter of legislative interest, policy, or oversight.  *See* Pl.'s Reply at

5–7.

In issuing their *Glomar* responses, Defendants essentially asserted that FOIA Exemptions 1 and 3 prevented them from acknowledging the existence of *both* categories of records.  The Court finds that Defendants are correct insofar as they cite those exemptions as justification for refusing to acknowledge the existence of "operational documents."  Defendants have not, however, plausibly explained why Exemptions 1 and 3 prohibit them from acknowledging the existence of "policy documents."  Accordingly, the Court finds that Defendants must conduct a search for "policy documents" in their possession.  After conducting such a search, Defendants will have an opportunity to assert a new *Glomar* response to the extent such a response is warranted, and to withhold any information that is protected by a relevant FOIA exemption.

## 1.  FOIA Exemptions 1 and 3 Justify Defendants' *Glomar* Responses Regarding "Operational Documents"

### a.  Exemption 1

Defendants principally rely on FOIA Exemption 1 to support their *Glomar* responses. Exemption 1 "allows the government to withhold matters that are 'specifically authorized under criteria established by an [e]xecutive order to be kept secret in the interest of national defense or foreign policy' and 'are in fact properly classified pursuant to such [e]xecutive order.'"  *Schaerr II*, 69 F.4th at 929 (quoting 5 U.S.C. § 552(b)(1)).  Because "national security is primarily the province of the Executive," the D.C. Circuit has instructed that courts should "decline to micromanage agency determinations that [properly classified] information should remain secret." *Id.*; *see also Ctr. for Nat. Sec. Stud.*, 331 F.3d at 927.  That being so, "[w]hen reviewing agency affidavits invoking Exemption [1], [courts] simply consider whether the agency has plausibly asserted that the matters are in fact properly classified pursuant to an executive order."  *Schaerr II*, 69 F.4th at 929; *see also Competitive Enter. Inst. v. Dep't of Treasury*, 319 F. Supp. 3d 410,

417 (D.D.C. 2018) ("When determining whether information was properly withheld under Exemption 1, the 'only question for the Court is whether the disputed [information] is properly classified under the applicable Executive Order.'" (internal alterations omitted) (quoting *Ctr. for Int'l Envtl. Law v. Office of Trade Representative*, 718 F.3d 899, 902–04 (D.C. Cir. 2013))).

Here, Defendants assert that the existence or nonexistence of the information PPSA seeks is classified pursuant to Executive Order 13,526 ("the Order"). *See* Classified National Security Information, Exec. Order ("E.O.") No. 13,526 § 1.1(a)(4), 75 Fed. Reg. 707, 707 (Dec. 29, 2009). The Order "sets forth both substantive and procedural criteria for classification." *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013). As relevant here, the Order provides that information may be classified only if: (1) an original classification authority classifies the information; (2) the information is under the control of the United States government; (3) the information pertains to one or more of the categories of information listed in section 1.4 of the Order; and (4) the classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to national security, and the authority is able to identify or describe the damage. E.O. 13,526 § 1.1; *see Competitive Enter. Inst.*, 319 F. Supp. 3d at 417.[3]

Defendants have plausibly explained that each of those four conditions is satisfied here. With respect to the first condition, each Agency submitted an affidavit from an individual possessing original classification authority stating that the information is properly classified. *See* Decl. of Linda M. Kiyosaki ("NSA Decl.") at ¶¶ 2, 17, 21, ECF No. 26-1; Decl. of Vanna Blaine

---

[3] The Order further states that an agency "may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified." E.O. 13,526 § 3.6(a); *see Gov't Accountability Project v. CIA*, 548 F. Supp. 3d 140, 147 n.3 (D.D.C. 2021).

("CIA Decl.") at ¶¶ 2, 16, ECF No. 26-2; Decl. of Gregory M. Koch ("ODNI Decl.") at ¶¶ 3, 19, ECF No. 26-3; Decl. of Michael G. Seidel ("FBI Decl.") at ¶¶ 2, 24, ECF No. 26-4.[4]  As for the second condition, PPSA does not contest that the information is under the control of the United States government.  *See Schaerr I*, 435 F. Supp. 3d at 111.

That leads to the third condition, which requires that the information "pertain to at least one of eight subject-matter classification categories" described in section 1.4 of the Order.  *Jud. Watch*, 715 F.3d at 941.  One of the categories described in that section "includes information pertaining to intelligence activities, sources, or methods."  *Knight First Amend. Inst.*, 11 F.4th at 818 (citing E.O. 13,526 § 1.4).  All of the affiants state that the information at issue pertains to intelligence activities, sources, or methods.  For example, the NSA's declarant asserts that disclosing whether the information exists would reveal details relating to the "who, what, when, and how" of the agency's "collect[ion], process[ing], analy[sis], produc[tion], and disseminat[ion] [of] signals intelligence" as well as that agency's "technical capabilities, sources, and methods."  NSA Decl. at ¶¶ 20, 22.  Declarants for the CIA, the ODNI, and the FBI all make similar attestations.  *See* CIA Decl. at ¶¶ 16–20; ODNI Decl. at ¶¶ 13–14, 19–20; FBI Decl. at ¶¶ 27, 29–30, 32.

Finally, Defendants' declarants describe in detail the various ways in which disclosure of the information at issue could be expected to result in damage to national security.  For instance, multiple affiants state that acknowledging or disavowing the existence of responsive records would reveal information about whether the Agencies gathered information on the individuals identified in PPSA's request, and, in doing so, would disclose sensitive information regarding the

---

[4] Individuals submitting affidavits on behalf of the OIP and the NSD deferred to the declaration submitted by the FBI.  *See* Decl. of Jonathan M. Breyan ("OIP Decl.") at ¶¶ 13–14, ECF No. 26-5; Decl. of Kevin G. Tiernan ("NSD Decl.") at ¶ 12, ECF No. 26-6.

Agencies' intelligence-gathering priorities and activities.  *See* NSA Decl. at ¶ 21; CIA Decl. at ¶¶ 18, 21; FBI Decl. at ¶ 32.  Relatedly, the declarants state that such disclosure could reveal the Agencies' interest in a particular individual, while simultaneously alerting that individual of the types of "intelligence sources or methods being employed . . . to collect information on them." ODNI Decl. at ¶ 20; *see* CIA Decl. at ¶ 18.  And more generally speaking, the affiants describe how disclosure of the information could harm national security by revealing information regarding the Agencies' technical capabilities and limitations—information that would, in turn, make it easier for adversaries or individuals to avoid data collection efforts in the future.  *See* NSA Decl. at ¶¶ 21–22; CIA Decl. at ¶ 17; ODNI Decl. at ¶ 20.  In the same vein, the declarants express concern that disclosure could also reveal information about how the Agencies do—or do not—collect information, thereby aiding adversaries in their measures to protect information from collection.[5]  *See* ODNI Decl. at ¶ 20; CIA Decl. at ¶¶ 19–21.

As noted above, the Court must "accord[] substantial weight" to Defendants' "affidavit[s] concerning the details of the classified status" of the information at issue.  *Schaerr I*, 435 F. Supp. 3d at 113 (quoting *Ctr. for Nat. Sec. Stud.*, 331 F.3d at 927).  Thus, after thoroughly examining the declarations submitted by the Agencies, the Court finds that the information is classified pursuant to Executive Order 13,526 and properly falls within FOIA Exemption 1.  The Court further finds that Defendants have offered a logical and plausible explanation for why the "unauthorized disclosure [of the information] would damage national security and compromise intelligence sources and methods," *Schaerr II*, 69 F.4th at 930, at least insofar as "operational documents" are concerned.  As a result, the Court concludes that Defendants' *Glomar* responses

---

[5] All of the agencies also certify that the withholding of the information sought by PPSA is not for unlawful purposes but rather to protect national security.  NSA Decl. at ¶ 26; CIA Decl. at ¶ 22; ODNI Decl. at ¶ 19; FBI Decl. at ¶ 33.

properly invoke Exemption 1 as a basis on which to neither confirm nor deny the existence of "operational documents."

PPSA resists this conclusion.  First, PPSA argues that Defendants fail to show that the information was properly classified pursuant to various procedural requirements established by Executive Order 13,526.  *See* Pl.'s Cross-Mot. at 14–18.  More specifically, PPSA argues that Defendants have not shown that the withheld information (1) "was accompanied by declassification instructions" as required by sections 1.5 and 1.6(a)(4) of the Order; (2) "complied with the special procedures [established by section 1.7(d) of the Order] applicable to classifying information after that information has been requested through FOIA; or (3) "complied with any of the other transparency procedures required under the [O]rder."  *Id.* at 14.

As PPSA itself concedes, the Court has rejected this argument before.  *See PPSA II*, 633 F. Supp. 3d at 118–19*.*  In *PPSA II*, the Court explained that section 1.1 of the Order "provides four threshold requirements for proper classification."  *Id.* at 118.  When issuing a *Glomar* response based on FOIA Exemption 1 and the Order, an agency need only show that those threshold requirements have been met.  *See id.*; *see also Mobley v. CIA*, 924 F. Supp. 2d 24, 50 (D.D.C. 2013) (collecting cases "indicat[ing] that an agency need only satisfy the requirements of Executive Order § 1.1(a) to classify information properly for purposes of FOIA Exemption 1").  In other words, an agency need not additionally establish that a *Glomar* fact—that is, "the fact of the existence or nonexistence of responsive records," *Mobley*, 924 F. Supp. 2d. at 47—"meets [the Order's] *other* procedur[al] [requirements]," such as those found in sections 1.5 or 1.6, *PPSA II*, 633 F. Supp. 3d at 118.  To require otherwise would force "agencies to create a record in response to a FOIA request."  *PPSA II*, 633 F. Supp. 3d at 118 (quoting *Mobley*, 924 F. Supp. 2d. at 48–49).  And that, of course, "would be contrary to longstanding FOIA law.'"

*Mobley*, 924 F. Supp. 2d. at 49; *see Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 152 (1980) ("The [FOIA] does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained.").  The Court thus concluded, like others before it, that agencies do not need to "separately show that [a] *Glomar* fact complies with" any of the procedural requirements outlined in the Order except for those described in section 1.1.  *PPSA II*, 633 F. Supp. 3d at 119; *see also PPSA I*, 2022 WL 4365745, at *7–8; *Nat'l Sec. Couns. v. CIA*, No. 12-cv-284, 2016 WL 6684182, at *19 (D.D.C. Nov. 14, 2016); *Mobley*, 924 F. Supp. 2d. at 48–50.  The Court stands by that conclusion here.

PPSA separately argues that Defendants may not plausibly invoke Exemption 1 because various arms of the intelligence community (including some of the Agencies named in this case) have publicly acknowledged that they obtain commercially available information from third-party vendors.  *See* Pl.'s Cross-Mot. at 11.  In that vein, PPSA contends that the "methods of obtaining and analyzing [commercially available information] are already publicly available" and thus the "mere acknowledgement [of responsive records in this case] could not reasonably threaten national security."  *Id.* at 10–11.

PPSA's argument misses the mark.  Most fundamentally, PPSA does not grapple with Defendants' contention that acknowledging the existence of the requested information would reveal U.S. intelligence agencies' interest in—or collection of information on—*particular individuals*.  The evidence cited by PPSA tends only to show that Defendants have acknowledged that the intelligence community *generally* collects and uses commercially available information.  *See id.*  PPSA cites no evidence tending to show that any intelligence agencies have admitted to obtaining commercially available information on the *specific individuals* named in PPSA's FOIA request.  Lacking such evidence, PPSA fails to cast

sufficient doubt on the Agencies' explanation of the harm that could befall national security were Defendants to acknowledge the existence of the information at issue.  *Cf. PPSA I*, 2022 WL 4365745, at *10 (finding plaintiff's objection to agencies' invocation of Exemption 1 to be without merit where agencies had previously released general information relating to the subject of plaintiff's FOIA request but had not released information relating to the specific individuals mentioned in the request).

*b.  Exemption 3*

All Defendants except NSD also invoke FOIA Exemption 3 as a basis for their *Glomar* responses.  FOIA Exemption 3 permits an agency to withhold records that are "'specifically exempted from disclosure by statute' if that statute 'establishes particular criteria for withholding or refers to particular types of matters to be withheld.'"  *Schaerr II*, 69 F.4th at 930 (quoting 5 U.S.C. § 552(b)(3)).  To supportably invoke Exemption 3, an agency must show that "the statute claimed is one of exemption" and that "the withheld material falls within the statute."  *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009).

The Agencies that invoke Exemption 3 first point to the National Security Act of 1947, 50 U.S.C. § 3024(i), to justify their *Glomar* responses.  *See* Defs.' Mot. at 15–17.  As relevant here, the National Security Act requires the Director of National Intelligence to "protect intelligence sources and methods."  *Schaerr II*, 69 F.4th at 930 (quoting 50 U.S.C. § 3024(i)).  The statute also "prohibits the unauthorized disclosure of such sources and methods."  *Id.*  The D.C. Circuit has explained "that the mere acknowledgment of intelligence sources and methods may implicate the protections of the Act."  *Id.*

PPSA does not dispute—nor could it—that the National Security Act qualifies as "a valid Exemption 3 [withholding] statute."  *DiBacco v. U.S. Army*, 795 F.3d 178, 197 (D.C. Cir. 2015);

*see also CIA v. Sims*, 471 U.S. 159, 167 (1985).  And as explained above, the information sought

by PPSA plainly falls within the statute.  Requiring Defendants to acknowledge or deny the

existence of the requested information would be to require them to reveal potentially sensitive

information regarding intelligence sources and methods.  Because "[d]ivulging such information

is 'specifically exempted' under the National Security Act," Defendants have logically and

plausibly explained their reliance on Exemption 3.  *Schaerr II*, 69 F.4th at 930; *see also PPSA II*,

633 F. Supp. 3d at 120.[6]  That being so, the Court finds that—with the exception of the NSD—

Defendants' *Glomar* responses with regard to "operational documents" are independently

justified by that exemption.[7]

---

[6] The NSA also cites the National Security Agency Act of 1959, 50 U.S.C. § 3605, and a
criminal statute, 18 U.S.C. § 798, to justify its reliance on Exemption 3.  *See* Defs' Mot. at 17–
18.  In relevant part, the National Security Agency Act provides that "[n]othing in this chapter or
any other law . . . shall be construed to require the disclosure of the organization or any function
of the [NSA], or any information with respect to the activities thereof."  50 U.S.C. § 3605(a); *see
Sherven v. Nat'l Sec. Agency*, No. 22-cv-03163, 2023 WL 6291599, at *2 (D.D.C. Aug. 2, 2023).
And 18 U.S.C. § 798 "prohibits a person from knowingly and willfully disclosing 'any classified
information concerning the communication intelligence activities of the United States or
obtained by the processes of communication intelligence from the communications of any
foreign government, knowing the same to have been obtained by such processes.'"  *PPSA I*,
2022 WL 4365745, at *11 n.9 (cleaned up) (quoting 18 U.S.C. § 798).  The Court need not
decide whether these statutes also support the NSA's invocation of Exemption 3 because, as
discussed, the National Security Act is sufficient in and of itself to justify the NSA's *Glomar*
response.  *See id.* (declining to decide whether these statutes justified the NSA's Exemption 3
withholdings under like circumstances).

[7] To the extent the Court concludes that the FBI's and the OIP's *Glomar* responses are
justified under Exemptions 1 or 3, the Court need not and does not address whether those
agencies also properly invoked Exemptions 6, 7(C), or 7(E).  *See PPSA II*, 633 F. Supp. 3d at
120 n.6 ("Because the FBI's 'operational documents' are entitled to a *Glomar* response under
Exemptions 1 and 3, the Court will not separately analyze whether the FBI is also entitled to
invoke Exemptions 6, 7(C), and 7(E)."); *see also Larson*, 565 F.3d at 862–63 ("[A]gencies may
invoke the exemptions independently and courts may uphold agency action under one exemption
without considering the applicability of the other.").

### 2.  Defendants Must Conduct a Search for "Policy Documents"

In its cross-motion for summary judgment, PPSA contends that even if Defendants'
*Glomar* responses relating to "operational documents" are justified, Defendants' *Glomar*
responses cannot be sustained insofar as "policy documents" are concerned.  *See* Pl.'s Cross-
Mot. at 10, 21, 27; *see also* Pl.'s Reply at 5–8, 12.  In support, PPSA relies heavily upon the D.C.
Circuit's decision in *PETA*, 745 F.3d 535, and this Court's decision in *PPSA II*, 633 F. Supp. 3d
108.  Both decisions lend a great deal of credence to PPSA's contention.

First, take *PETA*.  There, the National Institute of Health ("NIH") issued a blanket
*Glomar* response under Exemption 7(C) after receiving the plaintiff's FOIA request for "all
official investigative reports, preliminary notes, testimonies, memos, meeting minutes, phone
conversations, emails and other materials related to all [NIH] investigations into complaints filed
in 2005–present regarding [three specifically named NIH grant recipients]."  745 F.3d at 539
(second alteration in original).  Based on the named individuals' strong privacy interests, the
D.C. Circuit approved the agency's *Glomar* response with respect to any information that would
associate the three specifically named individuals with an investigation.  *Id.* at 544.  However,
the panel separately found that, liberally construed, the plaintiff's FOIA request encompassed a
category of responsive documents that would *not* "necessarily reveal an investigation of the three
researchers," such as "documents showing that NIH responded to complaints about the three
researchers by conducting an investigation that did not target the researchers themselves."  *Id.*
That being so, the Circuit concluded that the agency's "blanket *Glomar* response" could not be
sustained.  *Id.* at 545.  It therefore ordered the agency to conduct a search for documents falling
within the narrow category of records that would not show whether an investigation targeted a
particular researcher.  *Id.*

Relying in large measure on *PETA*, this Court reached a similar result in *PPSA II*.  In that case, the FBI issued a blanket *Glomar* response under FOIA Exemptions 1, 3, 6, 7(C), and 7(E) in response to the plaintiff's FOIA request for "[a]ll correspondence between individual Senators or Congressman and any agency, or between an agency and Congressional Leadership and/or either or both Congressional intelligence committees, concerning the unmasking of Congressmen or Senators, including but not limited to correspondence from or to [specific Congressman or Senators]."[8]  633 F. Supp. 3d at 113.  This request, the Court explained, could be conceptualized as a request for two different categories of documents: "operational documents" on the one hand and "policy documents" on the other.  *Id.* at 117.  The first category included documents that would "reveal the FBI's operations, any fruits of such operations, and/or any resulting congressional unmasking."  *Id.*  The Court found that the FBI had persuasively explained why the mere existence of these documents would be covered by Exemptions 1 and 3, and thus held that the FBI did not need to conduct a search for those records.  *Id.* at 117–20.

The Court reached the opposite result with respect to "policy documents."  In so holding, the Court first explained that "policy documents" could include records "discuss[ing] congressional unmasking as a matter of legislative interest, policy, or oversight."  *Id.* at 117.  As an example of the type of document that might fall within this definition, the Court hypothesized a letter from a congresswoman to the FBI "solicit[ing] the FBI's views on unmasking policies in light of media reports on the topic."  *Id.* at 121.  Such a letter, the Court explained, "would not necessarily reveal sensitive information about the FBI's intelligence activities, sources, or methods."  *Id.* at 122.  Instead, its "existence would show Congress's interest in this field

---

[8] The term "unmasking" refers to "a formal request to reveal the identity of an anonymized person."  *Am. Ctr. for L. & Just. v. U.S. Nat'l Sec. Agency*, 474 F. Supp. 3d 109, 117 (D.D.C. 2020).

[without] necessarily uncover[ing] anything about the FBI's activities or capabilities." *Id.* That being so, the Court concluded that the FBI could not rely wholly on its blanket *Glomar* response and instead had an obligation to "conduct a search for 'policy documents.'" *Id.* The FBI's subsequent search revealed 220 pages of responsive records, 100 of which the FBI produced either in whole or in part. *See* Third Decl. of Michael G. Seidel at ¶¶ 4, 6–7, *Project for Priv. & Surveillance Accountability, Inc. v. U.S. Dep't of Just.*, 21-cv-2362 (D.D.C. Oct. 31, 2023), ECF No. 31-3.

*PETA* and *PPSA II* make clear that "an agency may issue a blanket *Glomar* response . . . only when 'the circumstances justify a *Glomar* response' for *all* categories of responsive records." *PPSA II*, 633 F. Supp. 3d at 122 (emphasis added) (quoting *PETA*, 745 F.3d at 541). And in light of the foregoing discussion, it is equally clear that, here, PPSA's FOIA request encompasses a category of records that are not covered by FOIA Exemptions 1 or 3.

Recall that PPSA seeks "[a]ll documents, reports, memoranda, or communications *regarding the obtaining*, by . . . the intelligence community [of commercially available information] regarding" specific current and former members of Congress. *E.g.*, NSA FOIA Request at 2–5 (emphasis added). PPSA correctly notes that the term "regarding" gives the request a broad scope. *Cf. Nation Mag., Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 888, 890 (D.C. Cir. 1995) (explaining that FOIA request for "all records and documents *pertaining to* [Ross] Perot" encompassed not only "records indexed under Perot's name" but rather all "information about Perot, even if it was not indexed under his name"); *Nicholls v. U.S. Off. of Pers. Mgmt.*, 863 F. Supp. 2d 4, 11 (D.D.C. 2012) (explaining that the phrase "relate to" in FOIA request "denotes only some connection or reference to the relevant object" (citation omitted)). So interpreted, it does not require immense creativity to imagine records that would

fit within the scope of PPSA's request without implicating the national security concerns raised

by Defendants.  For example, a letter from a member of Congress to the NSA inquiring as to

whether the NSA had purchased commercially available information on any of the listed

Senators or Congresspeople would fall within the scope of PPSA's request while simultaneously

not revealing whether the NSA had, in fact, purchased such information or whether the NSA had

a particular interest in surveilling the individual.  *See PETA*, 745 F.3d at 545 (citing similar

example in rejecting blanket *Glomar* response); *PPSA II*, 633 F. Supp. 3d at 121 (same).  In

other words, it is difficult to see how a document such as this would reveal sensitive information

about Defendants' intelligence activities, sources, or methods.  *See PPSA II*, 633 F. Supp. 3d at

122.[9]

 In sum, "[b]ecause there exists a category of responsive documents for which a *Glomar*

response would be unwarranted, [Defendants'] assertion of a blanket *Glomar* response . . .

cannot be sustained."  *PETA*, 745 F.3d at 545.  Instead, Defendants must conduct a search for

"policy documents."  To the extent that that search uncovers communications that reveal either

classified or sensitive national security information, Defendants may, of course, either renew

their *Glomar*-based objections or withhold documents under any relevant FOIA exemptions.

---

[9] For similar reasons, the Court finds that the FBI and the OIP have not plausibly explained why "policy documents" would be protected by Exemptions 6, 7(C), or 7(E).  Those agencies claim that official acknowledgment of the records sought by PPSA would necessarily "connect" the listed individuals to "law enforcement investigations"—a fact that would impinge on those individuals' privacy interests.  *See* Defs.' Mot at 20.  But a letter like the hypothetical one described above would do no such thing.  It would not necessarily indicate that there was, in fact, any active law enforcement interest in a specific individual.  At most, it might indicate that certain members of Congress were interested in whether they or their colleagues were being investigated.  *See PETA*, 745 F.3d at 544–45.  Similarly, the FBI and the OIP have not plausibly explained how acknowledging the existence of such records would "necessarily disclose any law enforcement procedure, technique, or guideline that would risk circumvention of the law under Exemption 7(E)."  *PPSA II*, 633 F. Supp. 3d at 122.

**V.  CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 26) is

**GRANTED IN PART AND DENIED IN PART** and Plaintiff's cross-motion for summary

judgment (ECF No. 29) is **DENIED**.  The parties are **ORDERED** to submit a proposed schedule

for further proceedings within two weeks of the issuance of this opinion.  An order consistent

with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  January 5, 2024                                             RUDOLPH CONTRERAS
                                                                            United States District Judge